Bryan S. Arce, Esq.
PA ID No. 308174
Arcé Law Group, P.C.
45 Broadway, Suite 430B
New York, NY 10006
(212) 248-0120
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA
----------------------------------------------------------------X          Index No.
TAKEISHA WALKER,

                              Plaintiff,
                                                                          **COMPLAINT**

            -against-
                                                                          Plaintiff Demands a
MALVERN INSTITUTE FOR PSYCHIATRIC                                              Trial by Jury
AND ALCOHOL STUDIES, INC.,

                              Defendant.
----------------------------------------------------------------X
Plaintiff, by and through her attorneys, Arcé Law Group, P.C., upon information and belief,

complains of Defendant as follows:


## NATURE OF THE CASE

1. Defendant MALVERN INSTITUTE FOR PSYCHIATRIC AND ALCOHOL STUDIES, INC.

   (hereinafter also referred to as "MALVERN INSTITUTE") is "the region's longest-tenured

   private addiction treatment provider … [which] helps people through compassion and respect,

   inspiring hope and joy in recovery."[1]  Sadly, as Plaintiff quickly learned while working for

   Defendant MALVERN INSTITUTE, African-American patients and employees did not

   receive the same "compassion and respect" as their Caucasian counterparts.  Specifically,

---

[1] https://www.malverntreatment.com/about/

Plaintiff was subjected to race-based discrimination, as well as a hostile work environment, and was terminated after repeatedly complaining about said discrimination.

2. Plaintiff complains pursuant to 42 U.S.C. §1981 and Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §2000e *et seq*. ("Title VII"), as well as the Pennsylvania Human Rights Act ("PHRA"), 43 P.S. §951[2], seeking damages to redress the injuries Plaintiff has suffered as a result of being harassed and discriminated against by the Defendant on the basis of her race, together with creating a hostile work environment, retaliation, and unlawful termination.

## JURISDICTION AND VENUE

3. The Court has jurisdiction pursuant to 42 U.S.C. §1981; 42 U.S.C. §2000e *et seq.*; 28 U.S.C. §1331, §1343 and supplemental jurisdiction thereto.

4. This action involves a Question of Federal Law.

5. Venue is proper in this district based upon the fact that a substantial part of the events or omissions giving rise to the claim occurred within the Eastern District of the Commonwealth of Pennsylvania.  28 U.S.C. §1391(b).

6. On or about June 29, 2021, Plaintiff joint filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Rights Commission ("PHRC").

7. On or about January 12, 2022, Plaintiff received a Notice of Right to Sue Letter from the EEOC.

8. This action is being brought within ninety (90) days of the Notice of Right to Sue Letter from the EEOC.

---

[2] Plaintiff will move to amend the Complaint to add discrimination and retaliation causes of action under the PHRA when she receives her right to sue letter from the PHRC.

## PARTIES

9. Plaintiff is an African-American female resident of the Commonwealth of Pennsylvania, County of Philadelphia.

10. At all times material, Defendant MALVERN INSTITUTE was and is a domestic business corporation duly incorporated under the laws of the Commonwealth of Pennsylvania.

11. At all times material, Defendant MALVERN INSTITUTE was and is an addiction treatment center, located at 240 Fitzwatertown Road, Willow Grove, Pennsylvania 19090 ("Willow Grove facility").

12. At all times material, Plaintiff was an employee of Defendant MALVERN INSTITUTE.

## MATERIAL FACTS

13. On or about June 17, 2020, Plaintiff began working for Defendant MALVERN INSTITUTE as an Overnight Supervisor. Plaintiff's job responsibilities included supervising support staff, maintaining the safety of patients and staff, providing clinical intervention to patients being admitted for drug and alcohol treatment, and submitting daily shift reports detailing patient behavior, as well as notable events of her shift.

14. In or around August 2020, Defendant MALVERN INSTITUTE's Caucasian Clinical Director, Sarah Gilman, became Plaintiff's supervisor. In this role, Ms. Gilman had one-on-one meetings with Plaintiff after every shift to discuss the events of the shift and any concerns Plaintiff may have had ("Post-shift meeting").

15. In or around September 2020, Plaintiff received a positive performance review and passed her 90-day probationary period.

16. However, around this time, Plaintiff began experiencing race-based discrimination from Defendant MALVERN INSTITUTE's patients and employees.

3

17. For example, on or about September 20, 2020, a Caucasian patient, Brandon (last name currently unknown), disobeyed Plaintiff and refused to reenter the facility after he finished smoking a cigarette.  When one of the Security Guards also told him to go back inside, Brandon responded, "I'm smoking my fucking cigarette and catching some air **so you and that Nigger Bitch can leave me alone**."  As Plaintiff walked away, **Brandon yelled that Plaintiff was a "Nigger bitch," as well as a "Nigger whore," and said that Plaintiff deserved "to be hung."**  ("Brandon incident").

18. The following morning, Plaintiff submitted her shift report and summarized the Brandon incident, including the fact that he called her a Nigger.  During the Post-shift meeting, Ms. Gilman told Plaintiff that she should not have put the Brandon incident in her shift report and that Plaintiff should only send such information to her and the Executive Director, Dr. Mark Combs.  Plaintiff was surprised by Ms. Gilman's instructions and asked how this issue was going to be addressed and if the patient could be transferred[3] to a different facility.  Ms. Gilman told Plaintiff that she would work on transferring the patient and "come up with a plan" with Dr. Combs but that while Brandon was still at the facility, **Plaintiff needed to try and avoid him**.  Plaintiff explained that given her job responsibilities, it would be impossible to avoid him.  Therefore, Ms. Gilman told Plaintiff to do her best to avoid Brandon and to let her know if he made any other racist comments.

19. Nevertheless, despite being aware of Brandon's racist comments and animus towards Plaintiff, Defendant MALVERN INSTITUTE took no corrective or remedial action towards him and he remained at the Willow Grove facility.  During this time, **Brandon continued to call Plaintiff racial slurs including "white man's whore" and "Nigger whore**."  Plaintiff

---

[3] Defendant MALVERN INSTITUTE has three locations and routinely moves patients between its locations.

continued to report Brandon's harassment and discrimination to Ms. Gilman but her complaints were ignored.

20. On or about September 21, 2020, Defendant MALVERN INSTITUTE's Counselor, Melissa Hood-March, emailed the nurses, counselors, and clinical aides, "Brandon is reporting that he had an altercation with a staff member. Patient is concerned that he is now being accused of being a racist and that this staff member told black members of the community and that now he feels unsafe … I am currently attempting to work through this with Brandon." A few minutes later, Plaintiff's coworker, Amanda Everly, replied and wrote, "According to the shift report he called [Plaintiff] the N word and this was witnessed and heard by other staff members as well. This is not OK on any level and there should be consequences." Plaintiff then replied on the email chain and confirmed Ms. Everly's email.

21. Shortly thereafter, in retaliation for Plaintiff's complaints of race discrimination, Ms. Gilman stopped having the Post-shift meetings with her.

22. On or about October 4, 2020, another Caucasian patient, Jennifer (last name currently unknown), about whom Plaintiff had previously complained[4], pushed Plaintiff and said, "**Get out of my way cunt**." In the heat of the moment, Plaintiff replied, "Acting like a bitch isn't becoming of you." Plaintiff then emailed Ms. Gilman about Jennifer's continued aggression and requested a meeting to discuss how to handle Jennifer's behavior.

23. On or about October 8, 2020, Ms. Gilman and Plaintiff met to discuss Jennifer. However, when Plaintiff arrived, Human Resources Director, Brendan Aurand, was present and told Plaintiff that Jennifer had reported that she (Plaintiff) called her a bitch. Plaintiff explained that she said "Acting like a bitch isn't becoming of you" after Jennifer had called Plaintiff a

---

[4] Jennifer routinely refused to take her medication and became aggressive when Plaintiff told her that she needed to do so.

cunt and pushed her. Nevertheless, despite this being the first time that Plaintiff was disciplined, in retaliation for her earlier complaints about race-based discrimination, Plaintiff was given a **final** written warning and instructed to avoid Jennifer.

24. Defendant MALVERN INSTITUTE gave Plaintiff a final written warning to create a pretextual paper trail to eventually terminate Plaintiff.

25. On or about October 10, 2020, Plaintiff observed Jennifer attempting to cut the line to use the phones and told her to wait her turn. Jennifer replied, "Fuck you and the phone" and stormed off. Shortly thereafter, Plaintiff emailed Ms. Gilman to document the latest incident with Jennifer.

26. On or about October 26, 2020, another Caucasian patient, Daniel (last name currently unknown), went outside the facility during unauthorized times to smoke and was told to stop by Plaintiff. In turn, Daniel yelled at Plaintiff and threw a chair at her. Plaintiff reported this incident in her shift report.

27. At this point, it became abundantly clear to Plaintiff that none of her Caucasian coworkers were suffering the same abuse from Defendant MALVERN INSTITUTE's Caucasian patients.

28. At all times material, Plaintiff reasonably believed that she was complaining about race-based discrimination.

29. Then, on or about November 8, 2020, an African-American patient, Charles (last name currently unknown), told Plaintiff that during his group sessions the counselor allowed the patients to play songs using the N word, to which the patients sang along and blatantly sang the N word. Plaintiff gave Charles a grievance form and emailed Ms. Gilman and Dr. Combs about Charles' complaint.

30. A few days later, Charles handed Plaintiff a filled-out grievance form complaining about his fellow patients' use of the N-word and Plaintiff handed it to Ms. Gilman.

31. Shortly thereafter, Charles told Plaintiff that Defendant MALVERN INSTITUTE did not take any action regarding his complaint and subsequently checked himself out of the Willow Grove facility before his treatment was complete.

32. In or around January 2021, Dr. Combs emailed Defendant MALVERN INSTITUTE's entire staff and explained that Defendant needed to make budget cuts.

33. The next day, in retaliation for Plaintiff's complaints about race-based discrimination, as well as to further discriminate against her, Ms. Gilman and Human Resources Manager, Lauren Howard, told Plaintiff that her hours were being reduced from 40 hours per week to 32 hours per week.

34. However, Plaintiff's white male counterpart, Benjamin (last name currently unknown), **who had less seniority than Plaintiff**, did not have his hours reduced.

35. In or around early February 2021, an African-American patient, Precious (last name currently unknown), told Plaintiff that she wanted to leave treatment because **the all-Caucasian counseling staff was neglecting her and favoring the Caucasian patients**.  Plaintiff spoke with Precious and was able to convince her to stay and finish her treatment.

36. On or about February 7, 2021, Defendant MALVERN INSTITUTE's Counselor Aide, Sean O'Connor, reported to Plaintiff that he discovered **"I hate black niggers" written on a wall in the men's bathroom and that a picture of the Proud Boys' Symbol was taped to the door of an African-American patient's room**.  *See* Ex. A.  Plaintiff immediately emailed Ms. Gilman and Dr. Combs photographs of the bathroom wall and the picture that was on the patient's door.  Additionally, Plaintiff reported the vandalism in her shift report and wrote

"**There have been several incidences of racism targeting black staff and black community members both directly and indirectly and nothing was said or done about it. This issue must be addressed, or a policy put in place concerning racism. This is unacceptable**."

37. Later that day, Ms. Gilman called Plaintiff and simply said, in reference to Plaintiff's report, "**One of the patients was probably playing a prank or a practical joke**." Plaintiff told Ms. Gilman that regardless of the intention, it was inappropriate and reminded Ms. Gilman that patients are not allowed to use a computer or printer. As such, Plaintiff explained that one of Defendant MALVERN INSTITUTE's employees must have allowed the patient to print out the picture.

38. Then, on or about February 8, 2021, a counselor at Defendant's facility, Brittney Flaherty, emailed Defendant MALVERN INSTITUTE's nurses, counselors, and clinical aides and wrote that Precious "**cannot take it here with the racism**" and wanted to leave the facility. Shortly thereafter, Plaintiff emailed Ms. Gilman and confirmed that Precious had previously complained to her of race discrimination. Ms. Gilman did not respond to Plaintiff's email.

39. However, that same day, Ms. Howard emailed Plaintiff to meet and discuss her reports of racial discrimination.

40. Accordingly, on or about February 10, 2021, Plaintiff met with Ms. Howard and said "I feel like nothing is being addressed and the lack of response makes it obvious that no one cares that this is going on … I also feel like I am being **targeted for reporting my concerns about the ongoing racism** because my hours have been cut when the white supervisors haven't, and I'm being called the N word repeatedly and nothing is being done about it." Ms. Howard told Plaintiff that she had explained to Dr. Combs that the "clock was ticking" to handle Plaintiff's

complaints and asked Plaintiff, "How do you want this to be handled?" Plaintiff was taken aback by the question and said, "**It's not for me to figure out. I'm the one being oppressed and abused here, and my employer isn't helping me**." Ms. Howard asked Plaintiff to think about how she wanted the issue handled and the meeting ended.

41. Nevertheless, Ms. Howard never followed up with Plaintiff and Defendant MALVERN INSTITUTE's patients continued their racist behavior.

42. For instance, on or about February 20, 2021, Plaintiff and Supervisor, Mariah Oliver, were making rounds to ensure patient safety and discovered that a Caucasian patient, Edward (last name currently unknown), was in his bathroom with the door locked, which is a violation of policy. Plaintiff and Ms. Oliver told Edward that they needed to see him to make sure everything was okay. Instead of complying, Edward shouted, "**Get away from my door Nigger bitch**," called Plaintiff and Ms. Oliver, "**Black whores**," and told them "Suck my dick." ("Edward incident").

43. After this occurred, Plaintiff told Ms. Oliver that her previous complaints had fallen on deaf ears and suggested that Ms. Oliver complain about the Edward incident. Therefore, Ms. Oliver told Plaintiff she would draft the email and send it on both of their behalves.

44. Later that day, Ms. Oliver sent an email explaining the Edward incident to Ms. Howard, Ms. Gilman, and Dr. Combs.

45. On or about March 27, 2020, a new patient, Jane Doe (first and last name being fictitious), checked into the Willow Grove facility and was observed losing consciousness by Clinical Aide, Samantha Walsh. As a result, Ms. Walsh told Plaintiff about the patient and she (Plaintiff) told the nurses, "It looks like we may have an overdose." Nurse, Marie Baptist, replied, "I'll watch the patient on the monitor."

46. Approximately thirty minutes later, Plaintiff heard Ms. Baptist running down the hallway yelling that a patient may have overdosed.  Assuming that it was Ms. Doe, Plaintiff went to her room and heard Ms. Baptist say to Ms. Doe, "We have to Narcan you because you can't stay awake."  Ms. Doe replied, "No, I don't want Narcan."  Ms. Baptist responded, "I was watching you on the monitor and you were unconscious" and Ms. Walsh added, "I called your name five times and you weren't responding so you can either get Narcan or go to the hospital."  ("Jane Doe incident").

47. After hearing this, Plaintiff left the room and called 911.  When Plaintiff came back to Ms. Doe's room, she learned that the Narcan was not administered because it was refused by the patient.  Shortly thereafter, the paramedics arrived and took Ms. Doe to the hospital.

48. Then, on or about March 29, 2021, Plaintiff finished her shift and was walking past the office of Director of Admissions and Utilization Management, Lesia Dmyterko, and overheard her say to Ms. Gilman, in reference to Plaintiff, "**Well good luck with handling the Harriet Tubman of [Defendant MALVERN INSTITUTE]**" to which Ms. Gilman laughed and responded, "I know right."  At that moment, Ms. Gilman and Ms. Dmyterko saw Plaintiff walk by the office.  As a result, Ms. Gilman approached Plaintiff and asked, "Are you OK? How was your shift?"  Plaintiff responded that her shift was fine and left for the day.

49. Yet, later that day, Plaintiff received a telephone call from Ms. Howard who requested that Plaintiff meet with her, Dr. Combs, and Ms. Gilman to discuss a comment Plaintiff allegedly made during the Jane Doe incident.  Ms. Howard also told Plaintiff that she had been removed from the schedule until this meeting occurred.  Plaintiff agreed to meet the following day.

50. On or about March 30, 2021, Plaintiff attended the meeting with Dr. Combs, Ms. Howard, as well as Ms. Gilman, and was asked if during the Jane Doe incident she heard the comment,

"I have to Narcan you because I don't have time to do any paperwork." Plaintiff denied hearing the comment and confirmed that Ms. Baptist, as well as Ms. Walsh, were present the entire time that she was in Ms. Doe's room. Ms. Howard then said that she would have to speak with Ms. Baptist and Ms. Walsh. At the end of the meeting, Plaintiff was told that she would be placed on administrative leave until the investigation was complete.

51. Defendant MALVERN INSTITUTE placed Plaintiff on administrative leave in retaliation for her repeated complaints of race discrimination.

52. Then, on or about April 1, 2021, Ms. Howard called Plaintiff and said, "After reviewing everything, another incident came across my desk, literally this morning, where your name was involved surrounding the safety of a patient … and because of this … we have decided to separate our working relationship with you." Because Ms. Howard did not provide information about the findings of the investigation into the Jane Doe incident, Plaintiff asked, "Why am I being fired?" Ms. Howard then cited the Jennifer incident as the reason for her termination. Therefore, Plaintiff responded "**It's obvious why I'm being terminated after hearing [Ms. Dmyterko] and [Ms. Gilman] call me the Harriet Tubman of [Defendant MALVERN INSTITUTE]. I am going to contact an attorney because you are targeting me because I've been complaining about my experience and incidents of racism here and no one has done anything to address it**" and hung up.

53. Defendant MALVERN INSTITUTE's stated reason for terminating Plaintiff is pretext because the Jennifer incident happened almost six months earlier and Plaintiff had repeatedly complained about race-based discrimination since then to no avail.

54. Defendant MALVERN INSTITUTE would not have harassed Plaintiff but for her race.

11

55. Defendant MALVERN INSTITUTE would not have terminated Plaintiff but for her complaints of race discrimination.

56. Defendant MALVERN INSTITUTE failed to provide Plaintiff with a workplace free from race-based discrimination.

57. Defendant MALVERN INSTITUTE approved of, and/or condoned, the acts of race-based discrimination and harassment to which Plaintiff was subjected by its residents and employees.

58. Defendant MALVERN INSTITUTE failed to take any action to protect Plaintiff, despite being aware of its residents and employees' racist behavior.

59. As a result of Defendant MALVERN INSTITUTE's actions, Plaintiff felt and continues to feel extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

60. As a result of Defendant MALVERN INSTITUTE's discriminatory and intolerable treatment of Plaintiff, she suffered, and continues to suffer, severe emotional distress and physical ailments.

61. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.  Plaintiff has further experienced severe emotional and physical distress.

62. As Defendant MALVERN INSTITUTE's conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages.

**AS A FIRST CAUSE OF ACTION**
**UNDER FEDERAL LAW**
**42 U.S.C. Section 1981**

63. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

64. 42 U.S.C. Section 1981 states in relevant part as follows:

   a. Statement of equal rights. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind and to no other.

   b. "Make and enforce contracts" defined. For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

65. Plaintiff, a member of the African-American race, was discriminated against because of her race as provided under 42 U.S.C. Section 1981, as well as being retaliated against for complaining about the harassment and has suffered damages as set forth herein. Defendant MALVERN INSTITUTE allowed and condoned a racially hostile work environment to exist at its facilities.

**AS A SECOND CAUSE OF ACTION**
**UNDER TITLE VII**
**DISCRIMINATION**

66. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

67. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq., as amended, for relief based upon the unlawful employment practices of Defendant. Plaintiff complains of Defendant's violation of Title

13

VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's race.

68. Defendant MALVERN INSTITUTE engaged in unlawful employment practices prohibited by Title VII by discriminating against Plaintiff on the basis of her race, together with creating a hostile work environment, and unlawful termination.

**AS A THIRD CAUSE OF ACTION**
**UNDER TITLE VII**
**RETALIATION**

69. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

70. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides that it shall be an unlawful employment practice for an employer:

> "(1) to … discriminate against any of his employees … because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

71. Defendant MALVERN INSTITUTE engaged in an unlawful employment practice, prohibited by 42 U.S.C. §2000e *et seq.* by discriminating against Plaintiff with respect to the terms, conditions, or privileges of employment because of her opposition to the unlawful employment practices of Defendant.

14

**AS A FOURTH CAUSE OF ACTION**
**UNDER COMMONWEALTH LAW[5]**
**DISCRIMINATION**

71. Plaintiff repeats, reiterates, and realleges each and every allegation in the above paragraphs of this Complaint as if more fully set forth herein at length.

72. The Pennsylvania Human Relations Act, 43 P.S. §955, provides that it shall be an unlawful discriminatory practice: "For any employer because of the race … to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract…"

73. Defendant MALVERN INSTITUTE engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of her race, together with creating a hostile work environment, and wrongful termination.

**AS A FIFTH CAUSE OF ACTION**
**UNDER COMMONWEALTH LAW[6]**
**RETALIATION**

74. Plaintiff repeats, reiterates, and realleges each and every allegation in the above paragraphs of this Complaint as if more fully set forth herein at length.

75. The Pennsylvania Human Relations Act, 43 P.S. §§951-963, §5(d) provides that "It shall be an unlawful discriminatory practice…for any person, employer, employment agency, or labor

---

[5] Plaintiff will move to amend the Complaint to add discrimination and retaliation causes of action under the PHRA when she receives her right to sue letter from the PHRC.

[6] Plaintiff will move to amend the Complaint to add discrimination and retaliation causes of action under the PHRA when she receives her right to sue letter from the PHRC.

organization to discriminate in any manner against any individual because such individual has opposed a practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act."

76. Respondent engaged in an unlawful employment practice prohibited by the Pennsylvania Human Relations Act, §5(d) by retaliating against the Complainant for complaining of race discrimination.

**WHEREFORE,** Plaintiff respectfully requests a judgment against the Defendant:

A. Declaring that the Defendant engaged in an unlawful employment practice prohibited by 42 U.S.C. §1981, Title VII, and the PHRA, by discriminating against Plaintiff on the basis of her race, together with creating a hostile work environment, retaliation, and unlawful termination;

B. Awarding damages to the Plaintiff, for all lost wages and benefits, past and future, back pay and front pay and to otherwise make Plaintiff whole for any losses suffered as a result of such unlawful employment practices;

C. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to reputation;

D. Awarding Plaintiff punitive damages;

E. Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action;

F. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendant's unlawful employment practices.

## JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE,** Plaintiff demands judgment against Defendant in an amount to be determined at the time of trial plus interest, punitive damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Dated: March 14, 2022
New York, NY

**Arcé Law Group, P.C.**
*Attorneys for Plaintiff*

By: */s/ Bryan S. Arce*
Bryan S. Arce, Esq.
PA ID No. 308174
45 Broadway, Suite 430B
New York, NY 10006
(212) 248-0120

17